IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF COLUMBIA

_____

**UNITED STATES OF AMERICA**

§
§
§
§
- vs -                                          §          CRIMINAL No.   06-268 (RJL)
§
§
**LEVAR SIMMS, also known as "Var,"**           §
§
Defendant.          §
§
_____

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S
MOTION TO SUPPRESS EVIDENCE AND STATEMENTS**

_____The United States of America ("United States" or "Government") opposes defendant

Levar Simms' Motion To Suppress Evidence and Statements ("Defendant's Motion") because, as

established below, the defendant was properly detained at the scene, his statements on the scene

was spontaneously made by him, thereafter Mr. Simms was properly arrested on probable cause,

the plain-view evidence in his car was properly seized from the vehicle, the other items obtained

seized from this car were properly seized as a result of an inventory search of the vehicle incident

to Mr. Simms' lawful arrest, Government will not seek to introduce in its case-in-chief the post-

arrest video-taped statement of Mr. Simms, and all of the evidence seized upon execution of the

search warrants issued in this case were lawfully obtained and should be admitted at trial.

*Background*

On August 14, 2006, Mr. Simms was arrested on probable cause by members of the

Metropolitan Police Department ("MPD") and charged with (1) Sex Trafficking, in violation of

Title 18, United States Code ("U.S.C."), Section 1591, and (2) Possession of Marijuana with

Intent to Distribute.  On September 12, 2006,  a District Court grand jury returned a three-count

Indictment against Mr. Simms, charging him with Interstate Transportation of a Minor for

Purposes of Prostitution, in violation of 18 U.S.C. § 2423(a)), Interstate Sex Trafficking of

Children, in violation of  18 U.S.C. § 1591, and Interstate Sex Trafficking By Force, Fraud, and

Coercion, in violation of  18 U.S.C. § 1591.  According to the allegations of the Indictment, on,

about, or between July 15, 2006 and August, 14, 2006, Mr. Simms knowingly transported

"L.B.,"  a minor under the age of 18 years, in interstate commerce, from North Carolina to

Washington, D.C., and from Washington, D.C., to Virginia, and from Virginia, to Washington,

D.C., and from Washington, D.C., to Maryland, and from Maryland to Washington, D.C., with

intent that "L.B." engage in prostitution. [*see* Count One]; and he knowingly recruited, enticed,

harbored, transported, provided, and obtained by any means,  "L.B,." a minor person under the

age of 18 years, knowing that "L.B." had not attained the age of 18 years and that "L.B." would

be caused to engage in a commercial sex act [*see* Count Two]; and he knowingly recruited,

enticed, harbored, transported, provided, and obtained by any means "L.B.," knowing that force,

threats of serious harm, and physical restraint would be used to cause "L.B." to engage in a

commercial sex act. [*See* Count Three]

## FACTS PERTINENT TO DEFENDANT'S MOTION TO SUPPRESS

### A Chance Encounter On the Street Initiates an Investigation

On August 14, 2006, at approximately 6:40 pm, uniformed Metropolitan Police

Department ("MPD") Officers assigned to the Fifth District were on routine patrol in the 1900

block of Rhode Island Avenue, N.E., which is awell-known high-prostitution "strip," when they

noticed a young female walking near the 7-Eleven Store wearing a wig and dressed in sexually

provocative clothing generally associated with street prostitutes who are soliciting "Johns."

Upon further evaluation, the Officers became convinced the female was a minor, who was probably about 15-16 years old.  As a result, the Officers approached the female and asked her for identification.  The young female (who turned out, in fact, to be 16 years old) initially provided the Police with a false name and date of birth.  Upon closer questioning, the 16-year old ("L.B.") provided the Police with her correct name and date of birth.  A WALES/NCIC search, using the correct name and date of birth, indicated that "L.B." had been reported as a "missing person" from Greensboro, North Carolina.  Upon further questioning, while still in the area of the 7-Eleven Store, "L.B." advised the Police, among other things, that she was engaged in prostitution, that her pimp was named "Levar," that Levar had kidnapped her in North Carolina, and had brought her to Washington, D.C., where he was keeping her (and two adult female prostitutes who also worked for him) at his apartment:  Apartment 11, 5011 Jay Street, N.E., and that Levar had taken photographs of her and the other prostitutes and had put them on the Internet."L.B." told the Police that Levar had a laptop computer that he used in his prostitution business, and that he provided "L.B." (and the other prostitutes) with the clothing they wore when they were working as prostitutes.  "L.B." provided a description of Levar's car (an older dark blue Ford Thunderbird), and she said Levar kept marijuana and cocaine at his apartment. "L.B." told the Police she had Levar's cell phone number.

The Victim Telephones Mr. Simms and He Responds to the 7-Eleven Parking Lot<br><u>and Makes Voluntary Statements</u>

While still in the area of the 7-Eleven parking lot, the Police asked the 16-year old if she would be willing to telephone Levar and to tell him that she had been stopped by the Police; which she did in the presence of the Officers.  A short time later, a man drove up into the 1900 block of Rhode Island Ave., N.E., in a dark blue 1988 Ford Thunderbird.  Seeing the face of the

driver, "L.B." told the Officers, "That's my pimp."

With this, two Officers approached the driver (Mr. Simms) and asked to see his driver's license. Mr. Simms produced a Washington, D.C., driver's license in the name of Levar Simms, with a date of birth of October 4, 1977. As Mr. Simms was handing his driver's license to one of the Officers, Mr. Simms asked what was going on and then seamlessly volunteered he had been at his mother's house when someone called him to say the Police were talking to his cousin. As he said this, Mr. Simms motioned toward "L.B." (who was by that time in the back of a Police cruiser) and said, "That's my cousin." When the Officer followed up on Mr. Simms' voluntary statement by inquiring how Mr. Simms was related to the 16-year old, Mr. Simms said she was "my brother's sister." When the Officer pointed out to Mr. Simms that his explanation of his genealogical relationship with the 16-year old meant that she was Mr. Simms' sister, rather than his cousin as he claimed, Mr. Simms became visible nervous. With this, the uniformed Officers informed Mr. Simms he was being handcuffed for his protection and for the protection of others, but that he was not as yet being placed under arrest.

From th Officers' vantage point outside of the 1988 Thunderbird, they could see in plain view a  laptop computer and assorted clothing normally associated with female prostitutes ( "ho-clothes"), such as high-heels, a "G-string," condoms, and Vaseline-type lubricant, etc.

### The Detectives Are Called and Arrive On the Scene

Because of the complexities and nuances of the situation before them, the uniformed Officers requested the assistance of Youth Division detectives, who have substantial experience in dealing with cases involving juvenile prostitution. The Youth Division was only 2 blocks away from the 7-Eleven Store, and the detectives arrived in short order. Upon their arrival on the

scene, the Youth Division detectives received a briefing from the uniformed Officers as to what had transpired up to that point in time. Thereafter, one of the Youth Division detectives, who had experience in Human Trafficking cases, transferred "L.B." from the marked cruiser into his unmarked vehicle and interviewed her on the scene for several minutes, in order to gain his own measure of "L.B.'s" credibility and the plausibility of her allegations.

The Defendant Is Arrested, Plain-view Evidence Is Seized, and
An Inventory Search Incident to Arrest is Conducted of the Defendant's Vehicle

Being satisfied by his interview with "L.B." the Youth Division detectives informed the uniformed Officers to place Mr. Simms under arrest and to transport him to the Fifth District Police Station. The uniformed Officers were asked not to provide Mr. Simms with his *Miranda* warnings, as the detectives intended to do that upon their arrival at the Fifth District. With the arrest of Mr. Simms, the plain-view laptop computer was recovered from the 1988 Ford Thunderbird, and the Thunderbird was then subjected to an inventory search subsequent to the arrest of Mr. Simms. That search recovered, among other things, a cellular telephone, a clear ziplock bag containing 14 smaller green ziplock bags, and one larger clear ziplock bag containing suspected marijuana (and which field-tested positive for marijuana), and a utility bill in the name of Levar Simms for 5011 Jay Street, N.E., Apartment #11.

Mr. Simms is Transported to the Fifth District And Invokes
His Fifth Amendment Rights

Mr. Simms was transported to the Fifth District by uniformed Police personnel and was placed in a holding cell. While in the holding cell, contrary to the detectives' instructions, a uniformed Officer read Mr. Simms his *Miranda* warnings. When Mr. Simms repeatedly stalled

on answering the questions on the PD-47,[1] the uniformed Officer became frustrated and wrote "No" to virtually all of the questions on the PD-47 (including Question #4: "Are you willing to answr any questions without having an attorney present?") and then wrote at 8:10 pm "Refused" on the defendant's signature line on the document.

The uniformed Officers did not interrogate Mr. Simms.

### Defendant Is Re-advised and Waives His *Miranda* Rights
### And a Video-taped Interview Is Begun

Following the arrival of the Youth Division detectives at the Fifth District, unaware that Mr. Simms had earlier refused to sign his Advice of Rights, the detectives invited Mr. Simms to accompany them to an interview room (he accepted) where at 9:10 pm they advised him of his *Miranda* warnings and he waived his rights and executed a PD-47 that effect.  Thereafter, as the detectives began a videotaped interview with Mr. Simms, he was re-advised of his *Miranda* rights at 9:15 pm and he again waived his rights and executed another PD-47 to that effect.  With two signed *Miranda* waivers in hand, the detectives, in good faith, began a videotaped interview with Mr. Simms.  In the course of that interview, an Officer interrupted the interview and informed the detectives that Mr. Simms had earlier invoked his *Miranda* rights.  Upon learning this, the detectives discontinued their interview of Mr. Simms.

### Search Warrants Are Sought, Obtained, and Executed

On August 16, 2006, FBI Special Agent William McDermott presented U.S. Magistrate Judge Alan Kay with an affidavit seeking warrants to search (1) the premises of Mr. Simms' apartment at 5011 Jay Street, N.E., Apartment #11, Washington, D.C., (2) the defendant's laptop

---

[1] Mr. Simms kept interrupting the reading of his Rights to him by asking repeatedly why he was under arrest and claiming he did not understand why he was there.

computer, and (3) his cellular telephone. [*See generally* 8/16/06 Affidavit]   Following his review

of the Affidavit, Judge Kay issued the three warrants requested, and asked S.A. McDermott when

he expected to execute the warrants.  Intending to execute the warrant on Apartment #11, 5011

Jay Street, N.E. that evening, S.A. McDermott indicated that day.  Apparently, as a result of

Agent McDermott's (unlimited) response, Judge Kay prepared the warrants with an abbreviated

window for their execution.  The warrant for Apartment #11, 5011 Jay Street, N.E., was executed

on August 16, 2006.[2]

However, following the execution of the warrant for Mr. Simms' apartment, S.A.

McDermott traveled to California and Texas on pressing matters in another criminal

investigation.  It was only on his return to Washington, D.C., that S.A. McDermott recognized

that Judge Kay had placed an abbreviated window on the execution of the warrants for Mr.

Simms' laptop computer and cellular telephone.  As a result, on August 31, 2006 Agent

McDermott prepared a second Affidavit that he presented to Magistrate Judge Kay on that day.

[*See generally* 8/31/06 Affidavit]   This Affidavit was presented in support of obtaining warrants

for the search of Mr. Simms' laptop computer and cellular telephone, both of which had

remained in police custody, but neither of which had yet been searched.  As is readily apparent,

the August 31, 2006 Affidavit mirrors closely the earlier Affidavit in support of the search of

those two items, however, it appropriately provides, as well, supplemental information that was

---

[2]  The search of the premises uncovered, *inter alia*, an abundance of clothing indicative of
female prostitution; a list of names of males with dates, time increments, and what appear to be
dollar amounts, *i.e.*, "John's" records; hotel receipts from hotels in North Carolina, Virginia, and
Maryland; and a framed photograph of Daveena Davis (one of Mr. Simms' adult female
prostitutes, who traveled from North Carolina to Washington, D.C., with Mr. Simms and the
victim) which photograph was identical to one that appeared on "Craig's List" advertisements
offering her "escort" services.

derived from the August 16, 2006 warranted search of Mr. Simms' apartment.  Following Judge

Kay's review of the August 31, 2006 Affidavit, he issued new warrants for the search of Mr.

Simms' laptop computer and his cellular telephone, both of which were timely executed.[3]

<u>THE ALLEGATIONS OF MR. SIMMS' MOTION</u>

In his Motion, Mr. Simms says that on August 14, 2006, Mr. Simms was "unlawfully

detained, interrogated and subsequently arrested by the police after the police, without probable

cause, unjustifiably determined and/or concluded that defendant had some connection with an

alleged minor female and the criminal offense of prostitution." [<u>Motion</u>, pages 1-2] The Motion

contends that Mr. Simms "made certain incriminating statements at the time of his unlawful

detention and arrest (to include an involuntary video taped statement.)" [<u>Motion</u>, page 2]

Thereafter, the Motion claims, "[p]ursuant to defendant's arrest, the vehicle in which he was

driving at the time was searched and certain items of evidence were seized therefrom."  [<u>Motion</u>,

page 2]   Later still, according to the Motion, and as a "result of defendant's unlawful detention,

interrogation and search of vehicle a search warrant was issued for the search of his residence,

i.e., Jay Street, NE, Washington, DC." [<u>Motion</u>, page 2]   The Motion complains that certain

items were seized as a result of the warranted search of the defendant's apartment.  [<u>Motion</u>,

page 2]

Hence, the Motion *first* claims, the defendant was unlawfully arrested and interrogated

Mr. Simms on the street without having provided him of his *Miranda* warnings.  [<u>Motion</u>, page

2, ¶ 3]   *Second*, the Motion complains of the warrantless search of the defendant's vehicle.

---

[3]  Located in Mr. Simms' laptop computer were numerous images of the victim in various
stages of undress, together with similar images of other females, numerous drafts of  "Craig's
List" advertisements for the services of the victim and others, pornography, etc.

[Motion, page 2-3, ¶ 3]  *Third*, the Motion alleges that the search of Mr. Simms' residence was unlawful, despite a warrant having been issued therefore, "because it was based on information they received from defendant's alleged statements and the unlawful search of defendant's vehicle." [Motion, page 3]

For the reasons set forth below, except for certain of the allegations related to the post-arrest video-taped statement of Mr. Simms, none of the allegations of Mr. Simm's Motion have merit and therefore his Motion should be denied.

### THE ALLEGATIONS OF DEFENDANT'S MOTION ARE WITHOUT MERIT AND SHOULD BE DENIED

### Mr. Simms' Statements To The Police on the Street Were Not Subject to Miranda

As previously indicated, Mr. Simms' Motion complains that the police "detained[,] arrested[,] and interrogated him without advising him of his *Miranda* rights." [Motion, page 2.] In his Motion, Mr. Simms seeks to shroud *both* his spontaneous statements to the Police in the 7-Eleven parking lot *and* his post-*Miranda* statements to the detectives at the Fifth District. Because the United States will not seek to introduce in its case-in-chief the video-taped statement of Mr. Simms at the Fifth District,[4] only his statements in the 7-Eleven parking lot remain in issue.  As established below, Mr. Simms' statements to the Police in the parking lot were not subject to the strictures of *Miranda*, because Mr. Simms was not in custody at the time and his

---

[4] The Government does not question – indeed it asserts – the good faith of the detectives who **twice** advised Mr. Simms of his *Miranda* rights and obtained written waivers from him before the began their video-taped interview with him.  Moreover, because the video-taped statement of Mr. Simms was "voluntary" statement of him, the Government reserves the right to the introduction of the video-taped statement of Ms. Simms, should Mr. Simms testify at trial in a manner inconsistent with that statement.

statements were made spontaneously by him.

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that "in the context of 'custodial interrogation'" certain procedural safeguards – namely, advising the accused of his right to remain silent and to have an attorney present – are necessary to protect a defendant's Fifth Amendment privilege against self-incrimination. *Id*. at 444, 479; *accord Rhode Island v. Innis*, 446 U.S. 291, 297 (1980); *see also Dickerson v. United States*, 530 U.S. 428, 436-36 (2000). In *Rhode Island v. Innis, supra*, the Supreme Court underscored that *Miranda's* procedural safeguards did not come into play unless the suspect must be *both* in custody *and* subject to interrogation. 446 U.S. at 298.

"Custody," for purposes of *Miranda*, requires either "'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (*quoting Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). The appropriate standard to be applied in determining whether a person's movement has been restrained to a degree associated with formal arrest and therefore is "in custody" is whether the actions of the police would induce "a reasonable man, innocent of any crime," to consider himself under arrest. *Conyers v. United States*, 237 A.2d 838, 840 (D.C. 1968) (*citing Hicks v. United States*, 382 F.2d 158, 161 (D.C. Cir. 1967). The standard the court must apply is an objective one, and does not depend on "the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994).

In the instant case, as established above, Mr. Simms was not "in custody" at the time he made the spontaneous statements he now seeks to suppress. Mr. Simms had just driven into the parking lot. The Police asked him for his driver's license. In response, Mr. Simms volunteered

-10-

an explanation for his presence in the parking lot and added (without being questioned by the Police) that the victim was his "cousin." Having introduced the topic for discussion, Mr. Simms cannot complain that the Police asked the innocent follow-up question, inquiring as to the genealogical connection between he and "his cousin," nor his silly, quickly-conceived response. At the time, Mr. Simms had not been told he was under arrest. He was not in handcuffs. He was standing in a public place. The Police did not rush or chase him, nor were any of their service weapons drawn. Moreover, Mr. Simms admitted *he knew the Police were in the parking lot and were with the victim **which is why he came there***. Because Mr. Simms invited the encounter with the Police, he cannot be heard to say that he was intimidated or caught off guard by a chance encounter with the Police. Other than asking Mr. Simms for his driver's licence (he had just been seen driving a motor vehicle on the streets and highways of the District of Columbia), there is no evidence that – prior to making the statements he now seeks to suppress – the Police made any attempt to force Mr. Simms to remain in the area, or that Mr. Simms sought to (or even secretly wanted to) leave the area, much less that the Police actively prevented him from departing.

Because Mr. Simms was not in custody at the time he made his statements to the Police at the scene and because Mr. Simms' statements were made spontaneously by him, in any event, Mr. Simms' Motion is without merit and should be denied.

"Interrogation," in the context of *Miranda* analysis, means "words or action . . . that the police should know are likely to elicit an incriminating response from the subject." *Innis*, 446 U.S. at 301. Questions that do not call for an incriminating response are not interrogation. *See Allen v. United States*, 290 F.2d 476, 479 (D.C. Cir. 1968) (*Miranda* warnings not required

before police may ask generic questions necessary to determine facts of a situation). Indeed, as the Supreme Court stated in *Miranda*, supra, "[g]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding." 384 U.S. at 477-78. Moreover, because *Miranda* is triggered only where there is interrogation, statements spontaneously volunteered by a subject are not subject to *Miranda*. *See United States v. Samuels*, 938 F.2d 875, 881 (D.C. Cir. 1989) (volunteered and spontaneous statements are admissible without *Miranda* warnings; *Bosley v. United States*, 426 F.2d 1257, 1261 (D.C. Cir. 1970) (*Miranda* permits the admissibility of a volunteered statement not the result of custodial interrogation); *United States v. Black*, 932 F. Supp. 327, 330 (D.D.C. 1996) (spontaneous statements by defendant in custody made prior to *Miranda* rights held admissible).

Here, as established above, when Mr. Simms was in the 7-Eleven parking lot and made the statements he now seeks to suppress, he was neither "in custody" nor subjected to an "interrogation." Because Mr. Simms was not in custody and was not subjected to interrogation at the time he made the statements of which he now complains, and because the statements were made spontaneously by him, in any event, *Miranda* does not apply. Because Miranda does not apply to the defendant's statements in the 7-Eleven parking lot, his Motion seeking their suppression is without merit and should be denied.

**As Their Investigation Progressed, the Police Developed Probable Cause
Prior to Their Arrest of the Defendant**

The central contention of Mr. Simms Motion is that the Police did not have probable cause to arrest him at the time he was actually taken into custody. Mr. Simms claim is fanciful, at best. It is well-established that probable cause "exists where 'the facts and circumstances

within [the arresting officers'] knowledge and of which they had reasonably trustworthy

information [are] sufficient in themselves to warrant a man of reasonable caution in the belief

that' an offense has been or is being committed." *Draper v. United States*, 358 U.S. 307, 313

(1959) (*quoting Carroll v. United States*, 267 U.S. 132, 162 (1925) (quotations and citations

omitted)); *see also United States v. Wesley*, 293 F.3d 541, 545 (D.C. Cir. 2002) (same).

Probable cause requires finding "only the probability, . . . not a prima facie showing, of criminal

activity." *Illinois v. Gates*, 462 U.S. 213, 230 (1983) (internal quotation marks omitted); *accord*

*United States v. Davis*, 617 F.2d 677, 692 (D.C. Cir. 1979), *cert. denied*, 445 U.S. 967 (1980).

  In determining whether there was probable cause to make an arrest or conduct a search, a

Court should evaluate the "totality of the circumstances" surrounding the search or arrest. *Gates,*

462 U.S. at 230. A "totality" analysis is particularly suited to these determinations because they

"are not technical; they are factual and practical considerations of everyday life on which

reasonable and prudent men, not legal technicians act." *Id.* (internal quotation marks omitted).

  Here, as established above, as their investigation progressed, the Police developed more

than ample grounds to arrest Mr. Simms in the 7-Eleven parking lot, which is precisely what they

did. Among other things, the Officers interviewed repeatedly the victim, "L.B.," a minor, who

had initially drawn the Officers' attention because she appeared to be a juvenile prostitute in a

high-prostitution strip. "L.B." eventually provided her name and admitted to police that she was

in fact engaged in prostitution. She provided a detailed account of how she had traveled from her

home in Pennsylvania to Greensboro, North Carolina and how she was eventually kidnapped in

North Carolina by "Levar," held against her will, and caused to engage in prostitution and pose

scantily clad for photographs that Levar placed on the Internet, and she was brought (with two

adult female prostitutes) by Levar to Washington, D.C.  She explained that once she had been

taken to Washington, D.C., Levar -- whom she called her "pimp" -- housed "L.B." and the two

adult female prostitutes at his apartment, 5011 Jay Street, N.E., Apartment #11.  She told the

Police that Levar kept assorted clothing for female prostitutes, marijuana, cocaine at that

apartment.  "L.B." provided details of how defendant conducted his business, including the fact

that he made use of a laptop computer.  She described "Levar's" car as being an older model dark

blue Ford Thunderbird.

A WALES/NCIC check performed by the Police confirmed that L.B. had been reported

as a "missing person" from Greensboro, North Carolina.

"L.B." told the Officers that she had "Levar's" cellphone number.  She agreed to, and did,

telephone "Levar" and gave him her location and told him the Police were questioning her there.

Minutes later, Mr. Simms drove into the parking lot in a older model dark blue Ford

Thunderbird, which corroborated a portion of what "L.B." had told the Police.  Immediately,

upon Mr. Simms' arrival on the scene, the victim identified Mr. Simms as her "pimp," which

offered further corroboration.  Mr. Simms' driver's license was in the name of "Levar Simms,"

supporting "L.B.'s" earlier statement that her pimp's name was "Var" or "Levar."  Mr. Simms

spontaneously claimed a close relationship with "L.B." (volunteering she was his cousin, and

stating that he had come to the parking lot because someone had just called him to say that the

Police were speaking to her), which further corroborated the fact that he had an ongoing

relationship with "L.B."  Mr. Simms' explanation of his genealogical relationship to the victim

was transparently fabricated.  Inside the Thunderbird, in plain view, were "Ho-clothes" and

accouterments (*e.g.*, high-heeled shoes, G-strings, condoms, lubricant, etc.), which afforded

-14-

further corroboration that what "L.B." had told the Police was the truth..

Then, the Officers called for the assistance of Youth Division detectives, because the Youth Division detectives have specialized experience in cases involving juvenile prostitution. The Youth Division detectives who responded did, indeed, have such experience. On arrival, after being briefed by the uniformed Officers, one of the Youth Division detectives transferred "L.B." to his unmarked cruiser where he interviewed her in order to gain his own measure of her credibility.

Only after the Youth Division detectives' were satisfied that they had probable cause to arrest Mr. Simms, was he placed under arrest.

The fact that police had received the information first-hand from "L.B." and were able to verify many layers of her story establish generously that there was "a fair probability" that, in arresting defendant, the officers were arresting someone who had been involved in criminal conduct. *Gates*, 462 U.S. at 246; *and see United States v. Lincoln*, 992 F.2d 356, 358 (D.C. Cir. 1993) (informant's reliable information and the officers' personal observations established probable cause to arrest the defendant for drug distribution); *Carey v. United States*, 377 A.2d 40, 45 (D.C. 1977) ( a report "which is demonstrably based on personal observation" is a factor "weighing heavily" in probable cause determination); *Galloway v. United States*, 326 A.2d 803, 804-05 (D.C. 1974) (("[i]t is enough that the police officer ... either had firsthand knowledge or received his information from some person -- normally the putative victim or an eyewitness -- who it seems reasonable to believe is telling the truth" (citation omitted)).

Because, as established above, the Police possessed an abundance of probable cause to arrest Mr. Simms at the time they so did, the claim in Mr. Simms' Motion to the contrary is

without merit.  Because the central claim in Mr. Simms' Evidence Motion is without merit, and

because each of the other contentions of Mr. Simms' Evidence Motion are based on this central

premise, all of the relief sought in Mr. Simms' Evidence Motion should be denied.

### Defendant's Vehicle Was Properly Searched Incident to His Lawful Arrest[5]

Defendant's Motion next moves to suppress the evidence recovered from his vehicle,

claiming, *inter alia*, that his vehicle was "searched without a warrant," and was "not conducted

pursuant to a lawful arrest," and that it was searched without his consent.  [*See* Motion, page 2-3]

In advancing his argument, however, Mr. Simms apparently turns a blind eye toward the well-

established body of controlling law on searches incident to arrest.

In *Chimel v. California*, 395 U.S. 752 (1969), the Supreme Court held that after making a

valid arrest, the police may make a full search of the defendant as well as the area under the

defendant's personal control at the time of arrest.  *Id*. at 763.  In *New York v. Belton*, 453 U.S.

454  (1981), the Supreme Court held that once a police officer "has made a lawful custodial

arrest of the occupant of an automobile, he may, as a contemporaneous incident to that arrest,

search the passenger compartment of that automobile."  *Id.* at 460 (footnotes omitted); *see also*,

*Thornton v. United States*, 541 U.S. 615, 623 (2004) ("Once an officer determines that there is

probable cause to make an arrest, it is reasonable to allow officers to ensure their safety and to

preserve evidence by searching the entire passenger compartment."); *Knowles v. Iowa*, 525 U.S.

113, 117-18 (1998) (when there is a custodial arrest, police may conduct a full search of the

passenger compartment of a car in order "to search for weapons and protect themselves from

---

[5] As previously established, certain items of evidence (*e.g.*, the laptop computer)  were
properly seized from Mr. Simms' vehicle because they were in plain view.

danger."); *Michigan v. Long*, 463 U.S. 1032, 1049 n.14 (1983) ("*Belton* clearly authorizes [an

automobile] search whenever officers effect a custodial arrest.").

Moreover, police may search a car incident to the arrest of a "recent occupant" of the car.

In *Thornton v. United States*, 541 U.S. 615 (2004), the Supreme Court counseled that a

"custodial arrest is fluid and the danger to the police officer flows from the fact of the arrest, and

the attendant proximity, stress, and uncertainty.  The stress is no less merely because the arrestee

exited his car before the officer initiated contact, nor is an arrestee less likely to attempt to lunge

for a weapon or to destroy evidence if he is outside of, but still in control of, the vehicle."  *Id.* at

621 (citations omitted); *see also United States v. Sholola*, 124 F.3d 803 (7th Cir. 1995) (search of

car incident to arrest proper even when the defendant was secured in the rear patrol car without

the ability to reach for a weapon or destroy evidence); *United States v. Woody*, 55 F.3d 1257,

1269 (7th Cir. 1995) (the search of the locked glove compartment was permitted even though the

defendant was handcuffed and seated in the rear of a police car while two other passengers were

outside the automobile).

Here, as established above, the Police lawfully arrested Mr. Simms after he was seen

exiting his car, but while he was standing next to it.  As a result, the Police were entitled to

search Mr. Simms' vehicle incident to that lawful arrest.  Moreover, the Police properly removed

the evidence from the vehicle that was in the plain view of the Officers.

Because the Officers properly searched Mr. Simms' vehicle incident to his lawful arrest

and because the Officers seized evidence from Mr. Simms' vehicle that was in their plain view,

Mr. Simms' Motion seeking the suppression of such evidence is without merit and should be

denied.

**Defendant's Attacks On the Search Warrants in this Case Are Meritless, and *Leon*
Renders Moot Defendant's Challenges, in Any Event**

The final claim in Defendant's Motion seeks to suppress the evidence seized by the

Police following the issuance of search warrants in this case.  As the basis for his claim, Mr.

Simms appears to say, in scattergun style, that the search warrants were obtained as a result of his

unlawful arrest and the subsequent unlawful search of his vehicle, as well as through the

information provided by him in his statements, which he also claims were illegally obtained from

him.  [*See generally* Motion, pages 1-4]  However, as established above, each of Mr. Simms'

claims – upon which this prayer relies – are without merit.  Because Mr. Simms' claims are

without merit, the relief he seeks based upon them must be merit-less, as well.

Moreover, to the extent that Mr. Simms is seeking to argue that the search warrants in this

case are somehow defective, that is, it is based on information that was illegally obtained by

police, such an argument would fail, in any event.  In *United States v. Leon*, 468 U.S. 897 (1984),

the Supreme Court recognized a "good faith" exception to the Exclusionary Rule.  *See generally*

LaFave, W.R., Search and Seizure, vol. 1, § 1.3(f) (West 3d ed. 1996).  At its core, *Leon* directs

that evidence obtained by officers acting in reasonable reliance on a search warrant issued by a

detached and neutral magistrate is admissible in the Government's case-in-chief despite the fact

that the search warrant is ultimately found to be unsupported by probable cause.  *Id.* at 923.  This

is so, unless the officer lacks "reasonable grounds for believing that the warrant was properly

issued."[6]  *Id.* at 922.

---

[6]  In this case, there is no claim of "bad faith" on the part of the Police, nor can there be.
Moreover, as is readily confirmed, the vast majority of the information in the Affidavit in support
of the search warrants came from the victim in this case, corroborated by the observations of the
Officers, themselves.

-18-

The Affidavit was drafted by an experienced FBI Agent.  [*See* <u>Affidavits</u>, page 1, ¶ 1] The search warrants were issued by an experienced federal Magistrate Judge.[7]  The warrants were in proper form and appeared lawful on their faces.  Because the Police had "reasonable grounds for believing that the warrant was properly issued," and because the Police acted in reasonable reliance that the search warrant was issued by a neutral and detached Magistrate Judge, the evidence seized in the execution of the search warrant is properly admissible at trial in the Government's case-in-chief, in any event.

WHEREFORE, for each of the independent reasons set forth above, Defendant Levar Simms' Motion to Suppress Evidence and Statements should be, in all things, denied.

Respectfully submitted,

JEFFREY A. TAYLOR (D.C. Bar No. 498610)
United States Attorney


By:  _____
BRUCE R. HEGYI (D.C. Bar No. 422741)
Assistant United States Attorney
Federal Major Crimes Section
555 Fourth Street, N.W., Room 4848
Washington, D.C.  20530
(202) 305-9637
(202) 353-9414 (fax)
www.bruce.hegyi@usdoj.gov

---

[7] Defendant's Motion does not claim that the Magistrate Judge was not "detached and neutral," nor could it.

By:   _____

DONNELL W. TURNER
Assistant United States Attorney
Federal Major Crimes Section
555 Fourth Street, N.W., Room 4235
Washington, D.C.  20530
(202) 305-1419
(202) 514-6010 (fax)
www.donnell.turner2@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 14th day of December, 2006, a true and correct copy of the above and foregoing GOVERNMENT'S OPPOSITION TO DEFENDANT"S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS was served by First Class Mail, postage pre-paid, upon:

LEONARD L. LONG, JR., ESQUIRE
1818 ELEVENTH STREET, N.W.
WASHINGTON, D.C.  20001-5015

_____
BRUCE R. HEGYI
Assistant United States Attorney