# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Crim. No. 06-268 (RJL)** |
| **v.** | : | |
| | : | **Sentencing: July 8, 2008** |
| **LEVAR SIMMS, aka "VAR,"** | : | |
| **Defendant.** | : | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States, by and through its attorney, the United States Attorney for the District of Columbia,  respectfully submits this memorandum in aid of sentencing.

## I.    BACKGROUND

The defendant comes before the court to be sentenced pursuant to his January 28, 2008, conviction by a jury of one count of Interstate Transportation a Minor for the Purpose of Prostitution, in violation of 18 U.S.C. § 2423(a).  The facts underlying this offense are as follows:

Sixteen-year-old Lynette Blair traveled to Greensboro, North Carolina, on or about June 22, 2006, to visit a good friend of her family – Renita Middleton.  Ms. Blair was a troubled girl – a juvenile delinquent – and under the terms of her supervision, Ms. Blair was supposed to reside with her mother, Leslie Blair, in Harrisburg, Pennsylvania.   Nonetheless, and with her mother's permission, Ms. Blair traveled to  North Carolina to spend part of the summer with Ms. Middleton.

Once she got to North Carolina, she stayed for a short period of time with Ms. Middleton. The relationship between Ms. Middleton and Ms. Blair became troubled, and Ms. Blair ran away. On July 4, 2006, Ms. Blair sought help from the Greensboro Police Department to retrieve her clothing from Ms. Middleton's house.  Later that same day, and again on July 6, 2006, Bs. Blair's

1

mother called the Greensboro Police Department to report her daughter as missing.[1]  In the early evening of July 6, 2006, Corporal Terry Brown picked up Ms. Blair at a local apartment complex. Corporal Brown testified at trial that when he saw her that day, Ms. Blair appeared to be fourteen- or fifteen-years-old, and that she was wearing age-appropriate clothing.

Corporal Brown transported Ms. Blair to the Act Together Youth Facility, a shelter for at-risk juveniles that was located in a residential area of Greensboro on the other side of the city from where Ms. Blair had been staying.  She was assessed there at around 10 p.m. by John Spruill, and was assigned to a room in the shelter.  Later that evening, Ms. Blair ran away from the Act Together facility.

Ms. Blair was only blocks from the shelter when she was approached by the defendant.  He drove up beside her in his Ford Thunderbird and told her to get in.  Ms. Blair asked why he wanted her, and he replied that she was going to make some money for him.  She replied that she was only sixteen years old, and refused to get in the car.  According to Ms. Blair, the defendant then forced her into the car.  He drove her to a "liquor house" in another part of Greensboro, and locked her in a room.  Ms. Blair was, according to her testimony, forced to stay in the room until she agreed to "dance" for the patrons of the liquor house.

Upon emerging from the room, Ms. Blair began to dance and perform for the patrons of the liquor house.  She was plied with alcohol and marijuana, and she met several other adult women who worked for the defendant.  One woman, Kimberly Jackson (aka Azeb Deeds), she came to know as the defendant's "bottom bitch."  While in North Carolina, she also met Sarita Middleton and

---

[1]     On that same day, Ms. Blair's juvenile probation officer applied to the court for a warrant for Ms. Blair because she had absconded from Dauphin County, Pennsylvania.

Daveena Bailey (aka Patrice Ruffin).  The defendant permitted Ms. Blair to retain some of the money she earned while dancing.

After several days, the defendant suggested that Ms. Blair accompany him to Washington, D.C., where, as he put it, she could make more money.  On or about July 15, 2006, the defendant drove Ms. Blair, Ms. Jackson, Ms. Bailey, and Sarita Middleton to Washington, D.C.  He installed himself and the girls in his apartment at 5011 Jay Street N.E., Apartment #11, and this served as the basis of their operations in Washington, D.C.

Once in Washington, D.C., Mr. Simms facilitated the advertisement of Ms. Blair in the "Erotic Services" section of the website known as Craig's List; these advertisement proffered Ms. Blair's sexual services in exchange for money.  Advertisements were also posted for Ms. Jackson and Ms. Bailey.  Potential clients would respond to these ads either by email or by calling the telephone numbers listed in the advertisements.  (Ms. Blair further testified that the defendant took her cell phone from her and swapped out its SIMM card, this providing her with a new number with a local area code that was used in her Craig List advertisements.)

At trial, Ms. Blair testified that the defendant, whom she called "Daddy," would drive she and the other girls to and from various hotels in Washington, D.C., Maryland, and Virginia.  The girls would meet with clients in these hotels, and also used the rooms – together with the defendant – to take additional photographs of themselves to post on the Internet.  Evidence introduced at trial established that the defendant had rented hotel rooms at the Knights Inn, in Laurel, MD, on 07/21/06, and at the Days Inn in College Park, MD, from 07/22/06 to 07/25/06.

Evidence at trial also established that – on at least one occasion – the defendant arranged for Ms. Blair to "walk the track" on Rhode Island Avenue in an area known for prostitution.  On August

14, 2006, members of the Metropolitan Police Department stopped Ms. Blair because she appeared to be underage. Once they confirmed that she was, in fact, a minor, officers asked her to call someone to pick her up. She placed a phone call to a number in her phone stored under "Daddy." Moments later, Simms arrived in the same Ford Thunderbird he had used to transport Ms. Blair to Washington, D.C. In the backseat of his car, officers found the computer used to post Ms. Blair and the other, adult prostitutes advertisements to Craig's List, along with multiple items of suggestive women's undergarments.

The defendant was arrested that same day. Upon arrest, he provided a series of conflicting statements concerning Ms. Blair and his relationship with her, and further admitted that the computer and the car he was driving did, in fact, belong to him.

## II.    SENTENCING CALCULATION

### A.    Statutory Maximums

Count 1: According to the 2006 version the code book, a violation of Title 18, United States Code, Section 2423(a) carries a minimum sentence of 5 years of incarceration and a maximum sentence 30 years of incarceration, a fine of $250,000, and a term of supervised release of between five years and life. See 18 U.S.C. §§ 2423(a), 3571(b)(3), 3583(k).[2]

---

[2]    Section 2423(a) was amended by the Adam Walsh Act on July 27, 2006. That amendment increased the mandatory minimum penalty to 10 years of imprisonment. The government did not establish on which specific days the defendant transported Ms. Blair from state to state. The time-frame during which the offense took place spans the period from July 7, 2006 (when the defendant picked her up) to August 14, 2006 (when she was discovered in Washington, D.C., by police). While it is possible that some of the acts of interstate transportation occurred after the change in the law, it is also likely that some acts of transportation occurred before the amendment took effect.

B.    Sentencing Guidelines Calculation

The Guideline calculation in the Presentence Report places the defendant's total offense level at 30.  See Presentence Report (PSR) ¶ 28. (This calculation contemplates a two level enhancement for the use of a computer to facilitate the offense, a two level enhancement because the defendant unduly influenced a minor to engage in prohibited sexual conduct, and a two level enhancement because the defendant knew or should have known that Ms. Blair was a vulnerable victim.  See PSR ¶¶ 20-22.)  The PSR calculates the defendant's criminal history score as 2, and his criminal history category as II.  See PSR ¶ 33.  The Guideline range for the defendant is therefore calculated at 108 to 135 months of imprisonment.  See PSR ¶ 61.

III.    GOVERNMENT'S RECOMMENDATIONS

For the reasons set forth below, the government respectfully recommends that the Court sentence the defendant to the middle of the applicable Guideline range – specifically, 120 months of imprisonment.  This sentence satisfies the requirements set forth in Title 18, United States Code, Section 3553(a), and is in line with Congress's most recent pronouncement on the appropriate punishment for crimes of this nature.

A.    Acceptance of Responsibility

The defendant does not accept responsibility for his conduct underlying the charges for which he has been convicted.  See PSR ¶ 14-15.

B.    Application of the Federal Guidelines post-*Booker*

In United States v. Booker, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in Blakely v. Washington, 124 S. Ct. 2531 (2004).  As a consequence, the

Court invalidated the statutory provision that made the Guidelines mandatory, Title 18, United States Code, Section 3553(b)(1). Booker, 125 S. Ct. at 756.

Nonetheless, and as the Supreme Court stated as recently this Monday, a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. See United States v. Gall, 128 S.Ct. 586 (2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark"). The district court should then consider all of the applicable factors set forth in Title 18 United States Code, Section 3553(a). See id. These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant" (18 U.S.C. § 3553(a)(1)); the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment (18 U.S.C. § 3553(a)(2)); the Sentencing Guidelines and related Sentencing Commission policy statements (18 U.S.C. § 3553(a)(4) and (a)(5)); and the need to avoid unwarranted sentence disparities (18 U.S.C. § 3553(a)(6)).

The Guidelines are the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions. See United States v. Rita, ___ U.S. ___, 127 S.Ct. 2456 (2007). The Guidelines represent the distillation of two decades of careful study of sentencing practices across the country, and correlate as well to the varying severity of crimes as defined by Congress. Indeed, the Sentencing Commission formulated the Guidelines only after initially canvassing prior sentencing practice and attempting to identify and assign weights to all the factors – both aggravating and mitigating – that judges traditionally used in determining

an appropriate sentence.  <u>See</u> United States Sentencing Comm'n, <u>Supplementary Report on the</u>
<u>Initial Guidelines and Policy Statements</u> 16-17 (1987); <u>see</u> <u>also</u> 28 U.S.C. § 994(m) (requiring
Commission to "ascertain the average sentences imposed . . . prior to the creation of the
Commission"); Comprehensive Crime Control Act of 1984, S. Rep. No. 98-225, at 168
(Commission should produce a "complete set of guidelines that covers in one manner or another all
important variations that commonly may be expected in criminal cases").  And the Sentencing
Commission has continued to study district court and appellate sentencing decisions and to "modify
its Guidelines in light of what it learns." <u>Booker</u>, 125 S. Ct. at 766-67 (the Sentencing Commission
will continue "collecting information about actual district court sentencing decisions  . . . and
revising the Guidelines accordingly").

  The Guidelines themselves are designed to calculate sentences in a way that implements the
considerations relevant to sentencing as articulated in Section 3553(a).  Any Guidelines calculation
is based on the individual characteristics of the offense and the offender, as required by Section
3553(a)(1).  Each Supreme Court Justice in the various opinions in <u>Booker</u> recognized the express
national policy goals, as articulated by Congress, that sentences be based on the offender's actual
conduct and history, and that sentenced be uniform across the country, to the extent possible.  <u>See,</u>
<u>e.g.</u>, <u>id.</u> at 761 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act
was to move the sentencing system in the direction of increased uniformity."); <u>id.</u> at 759 ("Congress'
basic statutory goal – a system that diminishes sentencing disparity – depends for its success upon
judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime
of conviction."); <u>id.</u> at 783 (dissenting opinion of Stevens, J.) ("The elimination of sentencing
disparity, which Congress determined was chiefly the result of a discretionary sentencing regime,

was unquestionably Congress' principal aim."); id. at 789 (dissenting opinion of Scalia, J.) ("the primary objective of the Act was to reduce sentencing disparity.")

The Guidelines themselves thus seek to implement – in a fair and uniform way – the offense specific characteristics that, themselves, comprise the "individualized assessment" the Supreme Court commends in Gall.  See Gall, at * 7.  It thus remains true that, absent unusual circumstances, the sentence in a criminal case should fall within the Guideline range as determined by the district court.  In this case, as explained further below, no unusual circumstances exist that warrant an exception to the preference for Guideline sentencing.  Therefore, the government respectfully recommends that the Court sentence the defendant within the applicable Guidelines range to 151 months of imprisonment, which will effectuate the requirements set forth in Section 3553(a).

        C.      Basis for Government's Sentencing Recommendation

 The government is requesting a sentence of 120 months imprisonment – at the middle of the defendant's Guidelines range.   Such a sentence is more than supported by the facts surrounding defendant's offense, and the risk of danger to children and the community that the defendant's criminally irresponsible conduct poses.

The defendant has been convicted of one count of Interstate Transportation a Minor for the Purpose of Prostitution, in violation of 18 U.S.C. § 2423(a).   The basis for the conduct underlying this conviction stems from the defendant's act of abducting a runaway from outside of a juvenile shelter, transporting her to Washington, D.C., and facilitating her acts of prostitution.

Lynette Blair is the very definition of a troubled, at-risk teenager.  Abused by her stepfather as a young girl, Ms. Blair acted out repeatedly.  As a result, Ms. Blair has been under supervision

by a juvenile caseworker since she was 12-years-old. Her own mother was complicit in sending Ms. Blair to North Carolina to stay with Ms. Middleton.

When the defendant picked up Ms. Blair on July 6, 2006, it was close to midnight. Ms. Blair was alone, with no money, in a place she had never been before. At the very least, the defendant took advantage of her distress. The defendant then forced Ms. Blair to prostitute herself – repeatedly – for his benefit.

Defendant should be punished for his behavior and for the girl he chose. He chose a girl who was abused by her own family members. He chose a girl who was a runaway. He chose a girl who he found at night outside of a shelter for children. He chose a girl who, upon being made to lay down with random adult men in the back of their cars, in motel rooms, would never tell anyone. He chose a girl who would grow to love him and call him "daddy". Defendant relied upon the idea that, with this child, he could get away with it–for even if someone found out, no one would care. It is this behavior for which he should be punished.

IV.    **CONCLUSION**

Wherefore, the government respectfully requests that the Court sentence the defendant to 120 months of imprisonment.

Respectfully submitted,

JEFFREY A . TAYLOR
United States Attorney
Bar No. 498610


/s/

JULIEANNE HIMELSTEIN
Assistant United States Attorney
Federal Major Crimes Section
Mass. Bar No. 417-136
JOCELYN S. BALLANTINE
Assistant United States Attorney
Federal Major Crimes Section
California Bar No. 208-267
555 4th Street, N.W.
Washington, DC 20001
Phone: 514-8203
Fax: 514-6010

10